J.D. Isaacs
3553 West Chester Pike Unit #177
Newtown Square, PA 19073
Telephone: (212) 257-0737
Email: jdi@alum.dartmouth.org

FILED
APR 1 7 2014
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WESTERN TEXAS

| | |
|---|---|
| J. D. ISAACS<br><br>    Plaintiff, *pro se*,<br><br>-V-<br><br>DARTMOUTH HITCHCOCK MEDICAL CENTER;<br>DOCTOR CHRISTINE FINN;<br>MARY HITCHCOCK MEMORIAL HOSPITAL;<br>TRUSTEES OF DARTMOUTH COLLEGE;<br><br>and JOHN DOE,<br><br>    Defendants. | Case No. 14-mc-0012-XR<br><br>**REPLY TO**<br>**MOTION TO ENFORCE**<br>**SUBPOENA DUCES TECUM** |

# PLAINTIFF'S REPLY TO MOTION TO ENFORCE SUBPOENA DUCES TECUM

This reply addresses concerns raised by the Administrative Office of the U.S. Courts' PACER Service Center, as filed by the U.S. Attorney for the Western District of Texas in response to Plaintiff's motion for subpoena enforcement.

### Correspondence with the AOUSC Substantially Complied with *Touhy* Regulations

Although not formally captioned as a *Touhy* request, the Plaintiff attempted on multiple occasions to engage in dialogue with the AOUSC about the relevance of the subpoena records. Prior to filing this motion, Plaintiff sought to confer with the AOUSC for review of the subpoena via multiple emails. Plaintiff made several phone calls to Mr Sigmund Adams, the designated individual at the AOUSC. In the spirit of *Touhy*, he sent Mr. Adams a letter (Exhibit A) including a draft of this motion to enforce the subpoena, in hopes Mr. Adams would appreciate the relevance and avoid the need for judicial intervention. The letter specifically asked AOUSC to review the proposed motion **in order to confer** about the subpoena relevance:

> "*I am attaching a draft Motion to Enforce Subpoena, to be filed in San Antonio. I hope that after your review of the motion, you will reconsider whether or not to produce the records. I believe that these records may represent some of the last physical evidence of various civil and criminal allegations pending, and hence view them as critical evidence…*
>
> ***Again, the attached motion is only a draft intended to confer with you for your review.***"

The *Touhy* request can be an evolving process in which the original written request is supplemented and modified during the course of discussions and communications with the agency. (*U.S. v. Guild*, 2008 WL 169355 (E.D. Va. 2008); *In re PE Corporation Securities Litigation*, 2005 WL 806719 (D. Conn.). In fact, it is a good practice to try and meet each of the agency's objections through the use of supplemental written *Touhy* requests, so the record

that arrives at the court contains sufficient facts to support the request. *Westchester General Hospital, Inc.*, 770 F. Supp. 2d 1286; *In re PE Corp. Securities Litigation,* 2005 WL 806719 (D. Conn.). In the matter at hand, Plaintiff made diligent efforts to communicate with the AOUSC. Immediately upon filing the motion, Plaintiff again asked the AOUSC to consider his letters (Exhibit B) :

> *"Please let me know if you are able to make the negative declaration and avoid further work for the Courts[i.e retract the motion]."*

Next, Plaintiff inquired with the AOUSC on January 23, 2014 to see if they would be responding to the Motion to Enforce (Exhibit C), or if they might reconsider and confer with the Plaintiff:

> *"About a month ago I filed a motion to enforce the PACER subpoena, and sent you a copy. I have not yet been served with any response. Please let me know if you plan to respond[to the motion], or if I should file a motion for default, or if you have reconsidered to produce the PACER records."*

As the Court is aware, the AOUSC did not respond to the motion, nor did the AOUSC ever file a timely motion to quash the original subpoena. In short, the AOUSC ignored Plaintiff's attempts spanning five months to confer on the matter, and now incorrectly assert that the Plaintiff did not comply with the *Touhy* regulations.

Finally, the Plaintiff has today sent the US Attorney a further outline addressing the relevance of the PACER data (Exhibit D) to both civil and criminal claims filed with the U.S. Department of Justice.

A recent academic review cites *Touhy* as "fiction" in Federal litigation

A well cited recent summary of *Touhy* is found in *Georgetown Law Review* "Taking Touhy Too Far" (2011 Vol.99:1227):

> "Although some agencies continue to invoke an amorphous 'housekeeping privilege' to resist disclosing subpoenaed records, the vast majority of courts and commentators that have addressed the issue recognize that the housekeeping privilege is a fiction." citing *Hous. Bus. Journal, Inc. v. Office of the Comptroller of the*

JDIsaacs v. DHMC
Case No. 14-mc-0012-XR

*Currency*, U.S. Dep't of Treasury, 86 F.3d 1208, 1212 (D.C. Cir. 1996) ("[N]either the Federal Housekeeping Statute nor the *Touhy* decision authorizes a federal agency to withhold documents from a federal court."); *In re Bankers Trust Co.*, 61 F.3d 465, 470 (6th Cir. 1995) ("Section 301 . . . is nothing more than a general housekeeping statute and does not provide 'substantive' rules regulating disclosure of government information." (quoting *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 777 (9th Cir. 1994)));Exxon, 34 F.3d at 778 & n.6 ("[N]either the [housekeeping] statute's text, its legislative history, nor Supreme Court case law supports the government's argument that [the statute] authorizes agency heads to withhold documents or testimony from federal courts.... Every commentator we are aware of who has addressed the issue has reached the same conclusion."); *In re Motion to Compel Compliance with Subpoena Direct to Dep't of Veterans Affairs*, 257 F.R.D. 12, 15 (D.D.C. 2009) (noting that *Touhy* regulations do not "confer a separate privilege upon the government, nor create a legal basis to withhold information pursuant to a federal subpoena"); Coleman, supra note 25, at 688–89 & n.21("The proposition for which *Touhy* is often cited—that a government agency may withhold documents or testimony at its discretion—simply is not good law and hasn't been since 1958." (citing *Comm. For Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 792 (D.C. Cir. 1971) ("In our view, this claim of absolute immunity for documents in possession of an executive department or agency, upon the bald assertion of its head, is not sound law."))).

The matter at hand includes claims of federal retaliation, fraud, and subversion of process (see Exhibit D). Substantial damages to Plaintiff's health and career must be weighed against any decision to withhold important discovery material. As such, stretching *Touhy* to apply to this case seems to counter the vast majority of case law, as the Federal Rules of Civil Procedure (Rule 45) directly allows this Court to determine the substantive relevancy of the evidence pertaining to federal claims.

### *Touhy's* Role for Resource Allocation and Cost Saving

*Touhy's* implementations largely serve as measures to centralize and limit the resources the federal government expends on private litigation. In this case, two years of exhaustive litigation, now involving four federal courts, may be resolved by producing the easily retrievable PACER meta-data. In fact, the PACER data has already been retrieved by Mr. Ralph Gutierrez (see Exhibit D). If a cost-analysis were to be performed, it is hard to imagine any cost-justification against producing the readily available PACER data, which are critical to Plaintiff's case (See, again, Exhibit D). In fact, a jury trial (and/or appeals) may be averted by resolving any question of fact as to how and when Dartmouth learned about the 2006 litigation.

### Even under the APA standard, the AOUSC response appears somewhat arbitrary

An agency's rejection of a *Touhy* request will be considered arbitrary and capricious if it is merely a pro forma conclusory denial. *In re PE Corp. Securities Litigation*, 2005 WL 806719 (D. Conn.). More is required from federal agencies. They "must examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *In re Vioxx Products Liability Litigation*, 235 F.R.D. 334, 346 (E.D. Lou. 2005). "Likewise, an agency's action will also be considered arbitrary and capricious when it ... entirely failed to consider an important aspect of the problem. " *U.S. v. Walker*, 2009 WL 2611522 (M.D. Ga. 2009) (overturning agency denial of *Touhy* request) quoting *Miccosukee Tribe of Indians of Florida* v. U.S., 566 F.3d at 1257, 1264 (11th Cir. 2009).

In this case, Plaintiff offered the agency numerous occasions to discuss the relevance of the records sought. Likewise, Plaintiff declares that he made every possible effort to obtain discovery through other non-federal sources before PACER, but all have been unsuccessful or blocked by *nine* law firms representing the defendants. Plaintiff has been willing to make available to the AOUSC nearly forty hours of depositions (conducted *pro se)* and some ten-thousand pages of evidence. The agency failed to examine, even superficially, the discovery materials. Likewise, the agency failed to respond at all to Plaintiff's *Touhy* follow ups – on

three occasions, spanning five months. The agency provided no explanation for denial, other than boilerplate regulations. Moreover, the agency did not proffer a single claim for privilege, which it cannot do in good faith. In fact, there is no privilege that exists for the PACER meta-data. The data are merely time-stamps and corresponding account name identifiers. Routine subpoenas executed every day in the judiciary system reveal far more sensitive information than the PACER meta-data that. No privileged communications, opinions of judiciary employees, or personal testimony is sought; merely a time-data-name log of the $0.10 charges levied by PACER by those who viewed Plaintiff's 2006 lawsuit.

### Conclusion and Assent to *In Camera* inspection

For the aforementioned reasons, Plaintiff believes that *Touhy* has been substantially complied with in seeking the PACER billing meta-data. Moreover, the majority of case law and congressional and academic commentary suggest that *Touhy* does not dismantle the Federal Rules of Civil Procedure, which required PACER's subpoena compliance.

The AOUSC, via the U.S. Attorney's office, has offered an *In Camera* inspection subject to any protective order this Court deems necessary. The Plaintiff is agreeable to such compromise, and submits that several minutes inspection is likely to substantially reduce the overall resources the judiciary expends on the pending case. Furthermore, inspection of the PACER data promotes truth and fairness, and sets a precedent that might potentially avoid a retaliation like what Plaintiff experienced from ever occurring again.

Respectfully submitted, this 16th day of April, 2014.

*Jeffrey D. Isaacs*
Dr J. D. ISAACS (Plaintiff, *pro se*)
3553 West Chester Pike Unit 177
Newtown Square, PA 19073

# CERTIFICATE OF SERVICE

I, J.D. Isaacs, do declare as follows:

I certify that a copy of the foregoing **REPLY TO MOTION TO ENFORCE SUBPOENA DUCES TECUM** was delivered via email and USPS to PACER/US Attorney counsel, and to counsel for the Defendants.

Executed on this 16th day of April, 2014.

*Jeffrey D. Isaacs*
J. D. ISAACS

Plaintiff, *pro se*

JDIsaacs v. DHMC
Case No. 14-mc-0012-XR

# EXHIBIT A

Case 5:14-mc-00012-XR   Document 6   Filed 04/17/14   Page 8 of 18



Jeffrey Isaacs <jeffreydi@gmail.com>

## Re: PACER Subpoena

**Jeffrey Isaacs** <jeffreydi@gmail.com>  Mon, Nov 25, 2013 at 8:50 AM
To: Sigmund_Adams@ao.uscourts.gov

Dear Mr. Adams,

Thank you for your letter responding to the PACER records request. Upon reviewing the matter in further detail, I remain interested in obtaining the PACER records. I am attaching a draft Motion to Enforce Subpoena, to be filed in San Antonio. I hope that after your review of the motion, you will reconsider whether or not to produce the records. I believe that these records may represent some of the last physical evidence of various civil and criminal allegations pending, and hence view them as critical evidence. If PACER is in possession of records proving that individuals in Arizona or New Hampshire viewed the 06-3338 lawsuit in 2010/2011, I ask that these records also be referred to the FBI.

Furthermore, I ask that the PACER Service Center preserve the records, regardless of their content, because I understand the PACER service center only maintains 3 years of records before automatic deletion occurs. This motion may be subject to an appeal at the Circuit level or Supreme Court, and it is imperative that these records be preserved beyond 3 years so as to maintain any appellate authority over the matter.

Again, the attached motion is only a draft intended to confer with you for your review. Per the scheduling order of the District Court, I am required to file all discovery motions by late December. I am sending you this motion as far in advance as possible to allow your review.

Please do not hesitate to contact me if I can help clarify any details concerning this matter.

Regards,
Jeffrey Isaacs


On Mon, Nov 11, 2013 at 7:50 PM, <Sigmund_Adams@ao.uscourts.gov> wrote:
> Dear Mr. Isaacs:
>
> Please find attached a response to your subpoena served on the PACER Service Center in connection with *Doctor J.D. Isaacs v. Dartmouth-Hitchcock Medical Center, et al.,* Civil Action No. 12-cv-40-JL (D. N.H.).
>
> Sincerely,
> Sigmund R. Adams
>
> _____
> Sigmund R. Adams
> Assistant General Counsel
> Administrative Office of the U.S. Courts
> (202) 502-1100 (main)
> (202) 502-2915 (direct)
> (202) 502-1033 (fax)
> sigmund_adams@ao.uscourts.gov

**3 attachments**

📄 **subenforce.pdf**
112K

📄 **pacersubpoena.pdf**
168K

📄 **Jeffrey D. Isaacs Ltr.pdf**
180K

# EXHIBIT B



Jeffrey Isaacs <jeffreydi@gmail.com>

## Motion
1 message

**Jeffrey D. Isaacs** <jeffrey.isaacs.wg03@wharton.upenn.edu>   Mon, Dec 30, 2013 at 9:09 PM
To: Sigmund_Adams@ao.uscourts.gov

Dear Attorney Adams:

I am attaching the final motion which has been placed in the mail to the USDC for Western Texas. Several weeks ago , we discussed the possibility that you could provide a "negative response" that no academic institutions looked at CV-06-3338 in 2010-2011. Unfortunately I have not heard back, and the deadline for filing a motion to enforce the subpoena is near. Please let me know if you are able to make the negative declaration and avoid further work for the Courts.

Regards,
Dr Jeffrey Isaacs

**5 attachments**

- **pacersubpoena.pdf**
  168K
- **subenforce.pdf**
  119K
- **Jeffrey D. Isaacs Ltr.pdf**
  180K
- **exhibitC.pdf**
  313K
- **ExhibitD.pdf**
  7206K

# EXHIBIT C



Jeffrey Isaacs <jeffreydi@gmail.com>

## USDC San Antonio Motion to Enforce Subpoena

**Jeffrey D. Isaacs** <jeffrey.isaacs.wg03@wharton.upenn.edu>   Thu, Jan 23, 2014 at 7:11 AM
To: Sigmund_Adams@ao.uscourts.gov

Dear Attorney Adams,

About a month ago I filed a motion to enforce the PACER subpoena, and sent you a copy. I have not yet been served with any response. Please let me know if you plan to respond, or if I should file a motion for default, or if you have reconsidered to produce the PACER records.

Thank you for your attention to this matter.

Regards,
Dr Jeffrey Isaacs

# EXHIBIT D

Dear US Attorney Paniszczyn:

This letter pertains to civil matter 14-mc-12-XR and related reports I have previously lodged with my local FBI field office in Fort Washington, Pennsylvania. I write you to explain my belief that your office is in possession of PACER meta-data evidence that proves various federal civil and criminal claims.

This case goes well beyond a 'wrongful termination' claim and involves direct federal matters, not limited to the following:

     1) my medical career and my own well-being were sabotaged in retaliation for filing a federal disability lawsuit eight years ago.

     2) the federal government (via Medicare) reimburses hospitals approximately $300,000 for the training of each resident physician. If my training was terminated for fraudulent and/or retaliatory reasons, Medicare has lost a substantial investment in my graduate medical education. (I have reported this matter to the Office of Inspector General as well).

     3) likewise, the federal government Stafford loan scheme subsidized approximately $250,000 in tuition fees and loans for my M.D. degree. Unable to practice medicine, the federal government will likely lose these funds, unless I am able to prove my claims and resume my federally-funded residency position.

     4) at least eight witnesses perjured themselves in federal depositions, and intentionally destroyed relevant ESI discovery materials, in order to subvert justice and discredit my claims.

     5) hospital due-process termination policies were violated to discredit a federal litigation plaintiff, prior to a federal political appointment (World Bank nomination of Jim Yong Kim).

     6) this lawsuit itself has grown unnecessarily complex as a result of the alleged cover-up, and incurs substantial resource utilization of the Department of Justice. The case is currently in four federal courts, and declaratory judgment of the aforementioned destruction of ESI is pending application for a Writ of Certiorari. It is believed production of the PACER data would immediately end most, if not all, litigation by resolving the primary questions of fact.

My family and I raised the above issues with the FBI in July 2013, and was told that the matter was being referred to the Boston US Attorney's office for review of jurisdiction. At that time, I was unaware of the existence of the PACER data which are now subject to subpoena review. When I spoke by telephone with the PACER manager (Mr. Ralph Gutierrez) in San Antonio in October 2013, I was informed that responsive records exist for the subpoena, and that these records are being carefully preserved pending judicial review.

Below I summarize the various allegations I have made previously in federal court and to the FBI, with the hope that your office can piece together my allegations, in conjunction with the PACER meta-data in your possession, and resolve the claims one way or the other. This case has grown in complexity over the years and taken on a life of it's own. My hunch is that the PACER information may drastically simplify the matter and minimize resources the Department of Justice allocates to this case.

Generally, as set forth in the motion pleadings, I allege that a 2006 federal lawsuit motivated certain individuals to abuse me and retaliate against me. This resulted in the loss of my medical career and serious health impairments. Essentially, I was driven to the point of incapacitation while working nine months as a hospital intern, and have now spent two years in court trying to understand what happened.

I understand PACER's reluctance to be involved, but contrary to your suggestion in the filing dated April 14th (yesterday), I believe that I have already exhausted other discovery possibilities. As a *pro se* litigant, I face nine law firms that have blocked nearly every effort I have made to obtain justice. I believe PACER holds the last "smoking gun." Eight depositions have yielded witnesses that "don't recall" any relevant details. Entire email accounts have been spoliated, with no explanation given as to their disappearance. Witnesses were instructed by their lawyers not to disclose mobile phone numbers or email addresses that would allow for other avenues of e-discovery. As such, I have substantiated reason to believe the defendants, for two years, have obstructed justice by destroying evidence, perjuring themselves, and intimidating witnesses.

I noticed Dartmouth's president Jim Yong Kim of this lawsuit on January 14th 2012. In that letter, pursuant to FRCP 34 I requested that all email records relevant to my employment be preserved. It is now known that on January 17th, 2012, all these email records disappeared. I believe this was done maliciously and out of spite, in further retaliation for my *pro se* status. Additionally, my own medical records at Dartmouth, detailing my worsening medical condition, disappeared that day. It seems straightforward to me that a cover up commenced at that point.

In March 2012, I accused Jim Yong Kim of negligence in failing to address the procedural and criminal complaints I made to his office. His own hospital diagnosed me with mental shock, and I felt he had a duty to investigate my claims. Shortly thereafter, I was terminated from my position as a resident physician without any due process, hearing, or administrative leave required under Dartmouth's hospital bylaws. Subsequently, in late March, I employed a process-server to serve a summons to Kim. The process server was told by Kim's assistant that Kim was not at his residence. The process server testified that he believes Kim was in fact home and was evading the summons.

That same day, Kim was nominated to be President of the World Bank. I believe I was terminated, without due process, in part to discredit my claims against a federal appointee.

The link between my 2006 litigation and the 2013 retaliation at Dartmouth has been most

difficult to ascertain through discovery, especially considering the email records about my employment were deleted. However, it is known that a link exists, because Dartmouth's termination letter dated March 19th 2012 specifically ended my employment for reasons related to the 2006 litigation. However, discovery has not produced a single piece of evidence explaining how, when, or why Dartmouth learned of the 2006 litigation. The only statement Dartmouth made is that their attorney, one Edward Kaplan, first learned of the matter *after* January 15th 2012.

During the aforementioned depositions, all deponents testified that they did not learn about the 2006 litigation until late January 2012, which I believe is simply implausible. I believe the deponents are covering for someone, as they do not want to reveal how and when Dartmouth learned about the 2006 litigation. This matter has been the subject of roughly forty hours of depositions. I am willing to provide the depositions to your office to assist in your understanding of how the entire discovery thus far revolves around when Dartmouth learned of the litigation. *Essentially, if your PACER records show access to the 2006 litigation prior to January 15th 2012, then you have evidence that Dartmouth's witnesses are subverting justice in the federal court system and effectively abusing a pro se litigant.*

Moreover, I offered to dismiss civil claims against Jim Yong Kim if he could provide an affidavit that he did not have any relations or communications with the defendant from 2006, a colleague of his in international health at the NIH. Kim's attorneys declined the offer to drop civil charges in exchange for the requested affidavit. The PACER data, if it indeed shows accession to the 2006 litigation prior to January 2012, will reasonably easily allow me to identify the individuals who 'transmitted' knowledge and defrauded me. I simply cannot know their identities without the PACER data.

This letter is being forwarded to the criminal division of your office as I understand your role may be limited to the pending civil motion. Under *Touhy*, the disclosure process is meant to be ongoing, and I have made efforts to engage in dialogue with Mr. Sigmund Adams for the past six months. Now that I have provided you with more specific information, I hope you will reconsider production of the PACER documents. Likewise, I agree to your offer to *in camera* inspection of the records. I believe such an inspection would resolve my claims within a matter of minutes, saving the Justice Department considerable time and expense.


Sincerely,

*[signature: Jeffrey D. Isaacs]*

Jeffrey Isaacs